1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

BOY 1, BOY 2, BOY 3, BOY 4, BOY 5,
and BOY 6,

CASE NO. C10-1912-RSM

11

Plaintiffs,

ORDER GRANTING
DEFENDANT'S MOTION TO
DISMISS

12

v.

13

14

BOY SCOUTS OF AMERICA, a
congressionally chartered corporation
incorporated in the District of Columbia,

15

16

Defendant.

**I. INTRODUCTION**

17

18

This matter comes before the Court upon Defendant's Motion to Dismiss.  Dkt #s 6, 20.

For the reasons set forth below, Defendant's motion is GRANTED.

19

**II. BACKGROUND**

20

21

Plaintiffs are six adult men who were sexually abused by their scout leaders in connection

with their participation in the Boy Scouts of America organization ("BSA") when they were

22

23

children.   Plaintiffs allege that, long before Plaintiffs' abuse, BSA knew that it had a problem

24

with pedophiles and other sexual deviants infiltrating their ranks.  In 1910, shortly after BSA was

1    founded as a congressionally chartered corporation, BSA implemented an internal record

2    keeping system aimed at preventing scout leaders who were expelled for sexual deviance from

3    re- joining other scout troops.  Originally, the system entailed placing a red sticker on the

4    expelled or rejected man's registration card.  Later, the system grew into a large database in

5    which each flagged individual's name and suspected activity was logged and stored.   This

6    database became known as the Ineligible Volunteer Files ("IV Files").  According to Plaintiffs,

7    the IV Files highlighted BSA's vulnerabilities, including pedophiles' techniques for infiltrating

8    the BSA organization and grooming victims.  They also demonstrated biographical and

9    behavioral characteristics shared by the pedophiles that had been discovered within the

10   organization.

11         By 1935, the BSA had purportedly amassed a list of 2,000 ineligible volunteers.  In the

12   1970s, BSA executives destroyed thousands of IV Files.  According to Plaintiffs, had the files

13   not been destroyed, the BSA would have catalogued over 20,000 pedophiles in its files by 2005.

14   However, approximately 6,000 files survived the 1970s "purge," 1900 of which are now in the

15   public domain.

16         Plaintiffs allege that BSA opened a new IV File on a pedophile every other day for fifty

17   years, demonstrating that BSA knew or should have known that scouting attracts pedophiles at a

18   high rate and that scouting's distinctive characteristics attract pedophiles.  However, until the late

19   1980s, BSA's only background check for scout leaders was a check of the man's application

20   against the IV File list.   According to plaintiffs, some pedophiles who had been rejected from

21   the organization successfully reentered the BSA as scout leaders of different troops.  In addition,

22   BSA purportedly re-admitted some pedophiles it had previously removed for child abuse after a

23   period of "probation."  BSA had a practice of not reporting scout abuse incidents to law

24

1   enforcement and reaching agreements with suspected pedophiles in which pedophiles agreed to

2   leave the organization in exchange for the BSA not reporting incidents of child abuse to the

3   authorities.

4        Plaintiffs allege that BSA did not notify the public that the IV Files existed, did not

5   advise anybody of the number of pedophiles it was rejecting from scouting each year, and did

6   not advise scouts or their parents that it knew that its system did not completely prevent

7   pedophiles that had been rejected from BSA from re-infiltrating the organization.  Plaintiffs

8   claim that the IV Files constituted a "treasure trove" of knowledge about pedophilia and the BSA

9   but that the organization deliberately concealed the body of knowledge from police, scouts,

10  scouts' parents, and the general public.

11       Each Plaintiff alleges that had BSA warned Plaintiffs or their parents about the problem

12  of scout leaders molesting scouts or informed Plaintiffs or their parents about how to prevent

13  scout leader sexual abuse, Plaintiffs would not have joined or been allowed to join the BSA, or

14  would have taken steps to prevent the sexual abuse they ultimately suffered at the hands of their

15  scout leaders.  Plaintiffs bring claims against BSA for (1) negligence and breach of fiduciary

16  duty; (2) willful misconduct, wanton misconduct and reckless misconduct; (3) intentional

17  infliction of emotional distress; (4) violation of RCW 9.68A: Sexual Exploitation of Children

18  Act ("SECA"); (5) Estoppel and Fraudulent Concealment; and (6) Civil Conspiracy.

19       Plaintiffs Boy 4, Boy 5, and Boy 6 originally filed a separate action in this district (C10-

20  2032-RSM) in which Plaintiffs brought the same six claims against the BSA in connection with

21  three additional allegations of sexual abuse at the hands of scout leaders.    On April 5, 2011, this

22  Court granted Plaintiffs' motion to consolidate the two actions for the purposes of pre-trial

23  matters.  Dkt. #19.  At the time of consolidation, BSA had pending in each action nearly

24

1   identical motions to dismiss Plaintiffs' claims for failure to state a claim upon which relief could

2   be granted.  The pending motion in the C10-2032-RSM case was thereby transferred to the

3   instant case (Dkt. #20) for adjudication in conjunction with the motion to dismiss pending in the

4   case at bar (Dkt. #6).  The two motions to dismiss argue that Plaintiffs' claims should be

5   dismissed pursuant to Fed. R. Civ. P. 12(b)(6) because (a) BSA owed no duty to protect

6   Plaintiffs from the criminal acts of scout leaders; (b) Plaintiffs' claim for willful and wanton

7   misconduct is not an independent cause of action under Washington law; (c) Plaintiffs have not

8   pled the necessary elements for the claim of outrage; (d) Plaintiffs cannot recover under SECA

9   because no criminal violations have been pursued; (e) estoppel and fraudulent concealment are

10   not causes of actions recognized under Washington law; and (f) Plaintiffs' claim for civil

11   conspiracy is barred by the intracorporate conspiracy doctrine.  The Court hereby addresses the

12   two motions to dismiss, which are referred to in the singular form, as "Defendant's Motion to

13   Dismiss," for ease of reference.

14                                   **III. DISCUSSION**

15   **A.  Standard of Review**

16          Plaintiffs urge the Court to consider evidence outside the pleadings and thereby convert

17   Defendant's Motion to Dismiss into a Motion for Summary Judgment under Fed. R. Civ. P. 56.

18   The Court need not convert a Rule 12(b)(6) motion to a motion for summary judgment simply

19   because extraneous materials are introduced if the Court does not consider those materials in

20   deciding the motion.  *Keams v. Tempe Technical Institute, Inc.,* 110 F.3d 44, 46 (9th Cir. 1997).

21   Here, consideration of Plaintiffs' extraneous evidence is unnecessary to the resolution of

22   Defendant's motion.  Therefore, the Court declines to convert the motion.

23

24

ORDER GRANTING DEFENDANT'S MOTION TO DISMISS - 4

1    In considering a Rule 12(b)(6) motion to dismiss, the Court must determine whether the

2    plaintiff has alleged sufficient facts to state a claim for relief which is "plausible on its face."

3    *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1951 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550

4    U.S. 544, 570 (2007)).  A claim is facially plausible if the plaintiff has pled "factual content that

5    allows the court to draw the reasonable inference that the defendant is liable for the misconduct

6    alleged." *Id.* (citing *Twombly,* 550 U.S. 556).  In making this assessment, the Court accepts all

7    facts alleged in the complaint as true, and makes all inferences in the light most favorable to the

8    non-moving party.  *Baker v. Riverside County Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009)

9    (internal citations omitted).  The Court is not, however, bound to accept the plaintiff's legal

10   conclusions. *Iqbal*, 129 S. Ct. at 1949-50.  While detailed factual allegations are not necessary,

11   the plaintiff must provide more than "labels and conclusions" or a "formulaic recitation of the

12   elements of a cause of action." *Twombly*, 550 U.S. at 555.

13   **B. Negligence**

14   As a general rule, there is no duty to prevent a third party from intentionally harming

15   another unless "a special relationship exists between the defendant and either the third party of

16   the foreseeable victim of the third party's conduct."  *Hutchins v. 1001 Fourth Ave. Assocs.,* 116

17   Wash.2d 217 227 (1991).  In other words, a duty arises where: "(a) a special relation exists

18   between the [defendant] and the third person which imposes a duty upon the [defendant] to

19   control the third person's conduct, or (b) a special relation exists between the [defendant] and the

20   other which gives the other a right to protection." *Peterson v. State,* 100 Wash.2d 421, 426

21   (1983)(quoting Restatement (Second) of Torts § 315 (1965)).  BSA argues that Plaintiffs'

22   negligence claim should be dismissed because the BSA does not have a special relationship with

23   either the Plaintiffs or scout leaders.

24

1   "[S]pecial relationships are typically custodial," as between common carriers and their

2   passengers, or hotels and their guests.  *See Caulfield* 108 Wash. App. 242, 255 (2001).

3   However, a relationship need not be custodial where there is a direct, supervisory component.

4   *See Taggart v. State,* 118 Wash.2d 195, 219, 223, 822 P.2d 243 (1992) (special supervisory

5   relationship may arise when parole officers have taken charge of parolees they supervise, even

6   though there is no custodial relationship); *but see Cox v. Malcolm,* 60 Wash.App. 894, 900, 808

7   P.2d 758 (no special relationship between step-grandparent and step-grandchild), *review denied,*

8   117 Wash.2d 1014, 816 P.2d 1224 (1991).  In all cases, the duty to protect another person from

9   the intentional or criminal actions of third parties generally arises where one party is "entrusted

10  with the well being of another." *Niece v. Elmview Group Home,* 131 Wash.2d 39, 50 (1997)

11  (citing *Lauritzen,* 74 Wash. App. at 440)."  *See also Caulfield v. Kitsap County,* 108 Wash. App.

12  242, 255 (2001) (collecting cases). [1]

13          The Washington Supreme Court has yet to decide whether the BSA and similar youth-

14  serving organizations owe a duty towards the youth members of its organization to take

15  reasonable precautions to protect them from the danger of sexual molestation at the hands of

16  organization members.  The most analogous cases are those involving the negligence liability of

17  churches for the sexual abuse of child congregation members by clergy.  *See C.J.C. v.*

18  *Corporation of Catholic Bishop of Yakima,* 138 Wash.2d 699 (1999); *Doe v. Corporation of*

19

20  _____

21  [1] Doctors and patients, jailers and inmates, and teachers and students have all been found to have
    special relationships.  *See Caulfield,* 108 Wash.App. at 255.  *Webstad v. Stortini,* 83 Wash.App.
    857, 868 n. 6 (1996).  Courts have also found special relationships between a group home for the

22  developmentally disabled and its residents *see Niece,* 141 Wash.2d at 46; a hospital and its
    patients, *see Hunt v. King County,* 4 Wash.App. 14 (1971); a county and a profoundly disabled

23  person for whom it offered case management services, *Caulfield,* 108 Wash.App. at 255; and a
    church and the children of its congregation, *see C.J.C.,* 138 Wash.2d at 722.

24

1  *President of Church of Jesus Christ of Latter-Day Saints*, 141 Wash.App. 407 (2007). *C.J.C.*

2  held, as a matter of first impression, that "churches (and other religious organizations) [are]

3  subject to the same duties of reasonable care as would be imposed on any person or entity in

4  selecting and supervising their workers, or protecting vulnerable persons within their custody, so

5  as to prevent reasonably foreseeable harm." 138 Wash.2d 699, 722 (1999). Thus, a church

6  enjoys a special relationship with its "workers" and with "vulnerable persons within its custody."

7  *Id.* In the case at bar, Plaintiffs' complaint does not allege that the scout leaders were the BSA's

8  "workers," in the manner held sufficient to support a special relationship in *C.J.C.,* nor do

9  Plaintiffs allege that Plaintiffs were vulnerable persons in the custody of BSA. As a result,

10  Plaintiffs fail to state a claim for negligence upon which relief can be granted. Fed. R. Civ. P.

11  12(b)(6).

12     1.  <u>Special Relationship with Scout Leaders</u>

13       A special relationship imposing a duty to control a third party's criminal and intentional

14  actions requires a "definite, established and continuing relationship between the defendant and

15  the third party." *Taggart v. State,* 118 Wn.2d 195, 219 (1992) (quoting *Honcoop v. State,* 111

16  Wn.2d 182, 193 (1988)). Further, the defendant must have the actual ability to control the third

17  party's conduct. *See C.J.C.,* 138 Wn.2d at 724 (1999) ("duty to control does not require agency

18  relationship but arises where the ability to control is present."); *see also Osborn,* 157 Wash.2d at

19  24 ("Under the 'special relationship' doctrine, a public entity has a duty to control persons it has

20  authority to control.").

21       *C.J.C.* held that the church had a special relationship with a priest who abuses a member

22  of the congregation because, "[a]s in other agency relationships, a church chooses its officials,

23  directs their activities, and may restrict and control their conduct." 138 Wash.2d at 722. In

24  contrast, Plaintiffs here do not allege that BSA had the authority to control the actions of the

1   BSA Scout Leaders or that the relationship between the BSA and the individual leaders was of a

2   definite, established and continuing nature.[2] *Cf. Taggart,* 118 Wn.2d at 219; *C.J.C.,* 138 Wn.2d

3   at 724. Plaintiffs, in fact, do not describe the nature of the relationship between the BSA and the

4   scout leaders at all.  The court is not bound by Plaintiffs' conclusory statement that "BSA had a

5   special relationship with adult leaders it utilized to work with children, including Plaintiffs

6   whose parents entrusted them to BSA's care," Dkt. #1 at ¶42.  *Iqbal,* 129 S. Ct. at 1949-50.

7   Absent additional factual allegations to support this legal conclusion, the Court cannot establish

8   that a special relationship existed between the BSA and scout leaders.

9       2.   <u>Special Relationship with Plaintiffs</u>

10          Washington recognizes a "special relationship" between a defendant and a foreseeable

11  victim that may give rise to a legal duty to protect the victim from foreseeable criminal acts of

12  third parties in circumstances that are "protective in nature, historically involving an affirmative

13  duty to render aid." *Webstad v. Stortini*, 83 Wash.App. 857, 869 (Wash.App. Div. 2,1996)

14  (quoting *Hutchins,* 116 Wash.2d at 228, 802 P.2d 1360; citing W. Page Keeton et al., *Prosser*

15  *and Keeton on the Law of Torts* § 56, at 383 (5th ed.1984)).  In most of these cases, "the party

16  that has been found to have a legal duty was in a position to provide protection … because he or

17  she had control over access to the premises that he or she was obliged to protect."  *Lauritzen v.*

18  *Lauritzen*, 74 Wash.App. 432, 440-441, (1994).  *See, e.g., Hunt v. King County,* 4 Wash.App. 14,

19  _____

20  [2] The Court rejects Plaintiffs' contention that BSA is estopped from arguing that it does not
    control its scout leaders.  BSA submitted a brief in *Boy Scouts of Am. v. Dale*, 530 U.S. 640
21  (2000) in which it claimed that it retained the ability to refuse to register scoutmasters that did
    not meet its leadership standards.  BSA can retain control over the registration process while not
22  retaining control over the day to day activities of scout leaders.  *See Glover v. BSA,* 923 P.2d
    1383, 1389 n.3 (Utah 1996) ("[W]e fail to see how the right to discharge on these specific
23  grounds would in any way manifest the BSA's right to control the day-to-day operations of
    regular troop meetings.")  If Plaintiffs wish to allege that BSA had a special relationship with
24  scout leaders it must do so by including the necessary factual allegations in its complaint.

ORDER GRANTING DEFENDANT'S MOTION TO DISMISS - 8

1   *review denied,* 79 Wash.2d 1001 (1971) (holding that a hospital owed a disturbed and suicidal

2   patient a "duty to safeguard the patient from the reasonably foreseeable risk of self-inflicted

3   harm through escape"); *Shepard v. Mielke,* 75 Wash.App. 201, 205 (1994) (holding that

4   convalescent home owed its resident a duty to protect her from criminal actions by visitors where

5   resident "could not lock her door, screen visitors, or generally provide for her own safety" and

6   was at the home "precisely because she was unable to perform these tasks herself."); *Niece v.*

7   *Elmview Group Home*, 131 Wash.2d 39, 45 (1997).  Thus, Washington imposes a duty to protect

8   another where the other is deprived of his ordinary source of protection – in this case, his

9   parents.  *See also Bjerke v. Johnson*, 742 N.W.2d 660, 666 (Minn. 2007) (interpreting the

10  Restatement (2d) Torts § 314A as imposing a duty to protect where the defendant "substantially

11  deprived her of a child's primary source of protection—her parents.").

12          *C.J.C.* held that a church owes a duty or reasonable care to protect "vulnerable persons

13  *within their custody*." 138 Wash.2d at 722 (emphasis added).  Relevant to the analysis in *C.J.C.*

14  was the fact that "children of a congregation may be delivered into the custody and care of a

15  church and its workers, whether it be on the premises for services and Sunday school, or off the

16  premises at church sponsored activities and youth camps."  *Id.* at 721-22.  Here, Plaintiffs'

17  complaint does not allege that Plaintiffs were in BSA's custody or that BSA had control over the

18  premises when the alleged abuse occurred.  Rather, Plaintiffs allege that "[e]nrollment [in BSA]

19  secures parents' and children's commitment to follow a system that encourages parents to entrust

20  their children's health and safety to the BSA" and that the entrustment empowered BSA to

21  secure each child's oath "to adhere to a system that requires children to engage in activities that

22  expose them to adults and others" and "includes over-night outings, camping events, and trips

23  away from parents."  *Id.* at ¶13.  These allegations leave open the possibility that Plaintiffs may

24

ORDER GRANTING DEFENDANT'S MOTION TO DISMISS - 9

have been in BSA's custody for some period of time.  However, they fall short of directly

alleging that Plaintiffs were in BSA's custody and care at any point.  The Court is not bound to

accept Plaintiffs' conclusory assertion that "BSA had a special relationship with scouts and other

boys, including Plaintiffs, who participated in its programs," Dkt. #1 at ¶41, as true.  *Iqbal*, 129

S. Ct. at 1949-50.  Absent allegations that Plaintiffs were in the care or custody of the BSA, the

Court declines to hold that Plaintiffs were in the kind of special relationship with the BSA that

would give rise to a duty to protect the boy scouts from the intentional criminal acts of third

parties.

3. <u>Legal Foreseeability</u>

Under Washington law, the concept of legal foreseeability -- "whether the duty imposed

by the risk embraces that conduct which resulted in injury" – is contained within the element of

duty.  *Mauch,* 56 Wash. App. at 318.  Thus, "[t]he harm sustained must be reasonably perceived

as being within the general field of danger covered by the specific duty owed."  *Id.*  Even if

Plaintiffs had adequately alleged the necessary elements to establish that a special relationship

existed between BSA and scout leaders or BSA and Plaintiffs, they fail to allege that the harm

suffered by Plaintiffs was legally foreseeable.

In *C.J.C.,* the "difficult question" was "whether the harm sought to be prevented fell

within the scope of any duty."   *Id.*  Ultimately, the court determined that the abuse of the

plaintiff was legally foreseeable because special relationships existed between the church and

both (1) the plaintiff and (2) the priest, (3) there was a "causal connection between Wilson's

position in the Church and the resulting harm," and (4) the Church had prior knowledge of

"inappropriate sexual conduct by Orin Wilson (the alleged molester of the plaintiffs) toward a

young girl."   138 Wash.2d at 720.

1    Even if Plaintiffs had adequately alleged that a special relationship existed between BSA

2    and Plaintiffs and their scout leaders, they have not alleged the fourth factor – that BSA knew or

3    should have known that the individual scout leaders who molested Plaintiffs were likely to do so.

4    Plaintiffs allege that by the time Plaintiffs' were abused, BSA had been made aware of thousands

5    of instances of sexual abuse taking place within their organization.  However, Washington has

6    yet to impose liability on a church for the abuse of a member of the congregation at the hands of

7    a church worker absent evidence that the church knew or should have known of that worker's

8    deviant propensities.  *See also Doe v. Corporation of President of Church of Jesus Christ of*

9    *Latter-Day Saints*, 141 Wash.App. 407, 445 (2007) (dismissing negligence claim because of lack

10   of causal connection and because "unlike the church in *C.J.C.,* [the LDS church] had not been

11   warned that Taylor had previously abused children or made inappropriate advances towards

12   them.").  Given this precedent, this Court is reticent to hold that the BSA could owe a duty to all

13   boy scouts to protect them from sexual abuse at the hands of any scout leader, based solely on

14   generalized knowledge that some proportion of former BSA scout leaders had engaged in

15   inappropriate behavior with other scouts.

16         Granted, in *Niece,* the Washington Supreme Court held that a group home for the

17   developmentally disabled owed a duty to protect residents from sexual assault by an employee

18   even though the group home had no prior knowledge of the employee's dangerous propensities.

19   131 Wash.2d at 42.  In doing so, the court determined that a special relationship existed between

20   the group home and the resident plaintiff.  *Id.* at 47 ("Profoundly disabled persons are totally

21   unable to protect themselves and are thus completely dependent on their caregivers for their

22   personal safety.").  It then held that plaintiff's sexual assault was legally foreseeable "as long as

23   the possibility of sexual assaults on residents by staff was within the general field of danger

24

1    which should have been anticipated." *Id.* at 50.  Looking to prior sexual assaults at the facility,

2    an earlier policy against unsupervised contact with residents, expert testimony that such contact

3    was unwise, and legislative recognition of the problem of abuse in residential care facilities,

4    *Niece* held that "sexual abuse by staff at a group home for developmentally disabled persons may

5    be a foreseeable hazard against which reasonable precautions must be taken." *Id.* at 50-51.

6          *Niece* suggests that, where a defendant has a certain kind of special relationship with the

7    plaintiff, it may have a duty to protect the plaintiff from sexual assault by a third-party, based

8    solely on the knowledge of a generalized danger of assault.   Plaintiffs, however, have not

9    alleged the kind of special relationship present in *Niece*.  The profoundly disabled plaintiff in

10   *Niece* was "completely dependent" on the defendant for her personal safety.  *Id.* at 46.  She

11   suffered from cerebral palsy and had profound developmental disabilities including difficulty

12   with mobility and communication.  *Id.* at 42.  Plaintiffs do not allege that they were "completely

13   dependent" on BSA for their personal safety when the attacks occurred.  The Court is satisfied

14   that Plaintiffs, as children, were unable to protect themselves.  *See C.J.C.,* 138 Wn.2d at 726

15   (recognizing a strong public policy in favor of protecting children from sexual abuse).  However,

16   presumably Plaintiffs had parents or other legal guardians upon whom they were also dependent.

17   Absent specific allegations that Plaintiffs were unable to avail themselves of their ordinary

18   source of protection, and were relying entirely on BSA, specifically, for protection when the

19   abuse occurred, the reasoning of *Niece* is inapposite.

20         For all of the reasons above, Defendant BSA's Motion to Dismiss Plaintiffs' negligence

21   claims is GRANTED with leave to amend.

22   **C. Outrage**

23         Defendants seek dismissal of Plaintiffs IIED claim on the basis that Plaintiffs' allegations

24   do not satisfy the elements of the claim.   To succeed on a claim for outrage or IIED in

1   Washington, a Plaintiff must prove three basic elements: (1) extreme and outrageous conduct; (2)

2   intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of

3   severe emotional distress. *Rice v. Janovich*, 109 Wash.2d 48, 61 (1987) (citing Restatement

4   (Second) of Torts).  These elements are factual questions for the jury.  However, a trial court

5   faced with summary judgment must first determine "whether reasonable minds could differ on

6   whether the conduct was sufficiently extreme to result in liability." *Strong v. Terrell*, 147

7   Wash.App. 376, 385 (2008) (quoting *Robel v. Roundup Corp.,* 148 Wash.2d 35, 51 (2002)).  To

8   survive summary judgment, a claim of outrage must be predicated on behavior "so outrageous in

9   character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

10  regarded as atrocious, and utterly intolerable in a civilized community."  *Id.* (quoting *Grimsby*,

11  85 Wash.2d 52, 59(1975)).

12       Absent allegations that BSA had some specific knowledge that Plaintiffs might be in

13  danger of sexual assault by their scout leaders, BSA's conduct in not warning Plaintiffs of the

14  existence and contents of the IV files, and of failing to take measures to protect the Plaintiffs

15  from abuse, simply does not rise to the level of extreme, outrageous behavior.  Further, Plaintiffs

16  have not alleged that they suffered severe emotional distress as a result of BSA's actions, as

17  opposed to the actions of the scout leaders.  Accordingly, the Court GRANTS Defendants'

18  motion to dismiss the claim on the tort of outrage.

19  **D.  SECA Violation**

20       Defendant seeks to dismiss Plaintiffs' claim under the Sexual Exploitation of Children

21  Act ("SECA"), RCW 9.68A.  Under RCW 9.68A.090, "a person who communicates with a

22  minor for immoral purposes, or a person who communicates with someone the person believes to

23  be a minor for immoral purposes, is guilty of a gross misdemeanor."  SECA further provides that

24  "[a] minor prevailing in a civil action arising from violation of this chapter is entitled to recover

1    the costs of the suit."  RCW 9.68A.130.  Defendants argue that, because Plaintiffs do not allege

2    that the Plaintiffs' scout leader perpetrators were charged with SECA violations, no civil cause

3    of action may be brought for a "violation" of SECA, and therefore attorneys fees cannot be

4    awarded under RCW 9.68A.130.  Plaintiffs argue that the term "violation" does not require a

5    charge or conviction under SECA, but only predicate conduct that would violate the criminal

6    statute.

7         Only one court has addressed whether RCW 9.68A.130 applies to civil causes of action

8    arising out of conduct for which no criminal charges had been filed.  *See Roe v. City of Spokane,*

9    2008 WL 4619836 (E.D. Wash. Oct. 16, 2008).  The Eastern District of Washington observed in

10   *Roe* that, "[n]o Washington or federal decision permits recovery in a civil lawsuit under SECA

11   where no criminal violations have been pursued."  Accordingly, it dismissed a SECA claim on

12   summary judgment because no criminal SECA charges had been filed against the alleged

13   perpetrator of sexual abuse in that action.  *Id.* at *33-34.  On reconsideration, the *Roe* court

14   addressed the argument – sallied here by Plaintiffs – that the term "violation" in RCW 9.68A.130

15   does not necessarily require that the perpetrator be *charged* or *convicted* of a SECA violation.

16   *See Roe v. City of Spokane,* 2008 WL 4619837 (E.D. Wash. Oct. 16, 2008).  Nonetheless, it held

17   that "although it appears that the statute contemplates a right to recovery in a civil action for a

18   violation of the criminal statute, Plaintiffs failed to show a right to recovery on a claim of sexual

19   exploitation of a minor 'based on the facts of this case.'"  *Id.* at *5.

20        Other courts have been more receptive to the interpretation of SECA espoused by

21   Plaintiffs. *See, e.g., J.C. v. Society of Jesus,* 457 F.Supp.2d 1201, 1204 (W.D. Wash. 2006)

22   (declining to decide on the applicability of SECA, but noting that "the [Defendant]'s position that

23   civil liability can arise only after a *conviction* under SECA is inconsistent with the statute's

24

ORDER GRANTING DEFENDANT'S MOTION TO DISMISS - 14

1   conditioning of liability on a " *violation* " of SECA.") (emphasis in original).  *See also Kuhn v.*

2   *Schnall*, 155 Wash.App. 560, 577 (2010) (declining to address on a appeal whether trial court's

3   application of SECA attorneys' fees provision to sexual abuse case in which no criminal charges

4   had been filed was proper).  However, no other court has held as a matter of law that SECA

5   provides a right to recovery in a civil lawsuit where no criminal violations have been pursued.

6          Given the little guidance available to the Court in deciding whether the attorneys' fees

7   provision of SECA applies to the action before it, the Court declines to decide the issue at this

8   preliminary stage.  Plaintiffs must prevail on the underlying action in order to claim attorneys'

9   fees.   Should Plaintiffs prevail, the Court will request further briefing on the issue of attorneys

10  fees under SECA at that time.

11  **E.  Civil Conspiracy**

12         Civil conspiracy requires (1) two or more people engaged in activity to accomplish an

13  unlawful purpose or to accomplish a lawful purpose by unlawful means; and (2) an agreement

14  among such people to accomplish the object of the conspiracy.  *Wilson v. State,* 84 Wn. App.

15  332, 350-51 (1996) (citing *Corbit v. J.I. Case Co.,* 70 Wn.2d 522, 528-29 (1967)).  Defendant

16  BSA moves to dismiss Plaintiffs civil conspiracy for failure to allege the necessary element of

17  *two or more* people engaged in an activity, and for failure to comply with the heightened

18  pleading requirements under Fed. R. Civ. P. 9(b).  Plaintiffs do not respond to BSA's argument

19  respecting Plaintiffs' failure to comply with the heightened pleading standard.  A court may

20  construe a party's failure to respond to a motion as an admission that the motion has merit.  *See*

21  Local Rule CR 7(b).  Accordingly, Plaintiffs' civil conspiracy claim is dismissed without

22  prejudice.

23

24

**F.  Equitable Estoppel, Fraudulent Concealment, and Willful and Wanton Misconduct**

Plaintiffs concede that they are not pursuing claims for independent torts of equitable estoppel, fraudulent concealment, and/or willful and wanton misconduct.  Accordingly, to the extent that these theories and defenses are pled as independent causes of action in Plaintiffs' complaints, these claims are hereby dismissed with prejudice.  The Court declines to otherwise rule on the applicability of these theories at this time.

## IV. CONCLUSION

The alleged conduct in Plaintiffs' complaint is egregious and reprehensible.  However the complaint lacks the necessary factual predicate for recovery under the well-developed standards imposed by Washington common law.  Accordingly, having reviewed the relevant pleadings, the declarations and exhibits attached thereto, and the remainder of the record, the Court hereby finds and ORDERS:

(1) Defendant's Motions to Dismiss (Dkt. #s 6 & 20) is GRANTED with leave to amend.  Plaintiffs may file an amended complaint attempting to cure the above deficiencies by **Friday, June 17, 2011**. The amended complaint must carry the same case number as this one. If no amended complaint is timely filed, the Court will dismiss this complaint pursuant to Fed. R. Civ. P. 12(b)(6).

(2) The Clerk is directed to forward a copy of this Order to plaintiffs and to all counsel of record.

Dated this 19th day of May 2011.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE