UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BOY 1, BOY 2, BOY 3, BOY 4, BOY 5, and BOY 6,<br><br>Plaintiffs,<br><br>v.<br><br>BOY SCOUTS OF AMERICA, a congressionally chartered corporation incorporated in the District of Columbia,<br><br>Defendant. | CASE NO. C10-1912-RSM<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

**I. INTRODUCTION**

This matter comes before the Court upon Defendant Boy Scouts of America's ("BSA") Motion for Summary Judgment (Dkt. # 83). For the reasons that follow, the motion shall be GRANTED.

**II. BACKGROUND**

Plaintiffs, former child Boy Scout troop members, brought suit against the Boy Scouts of America ("BSA"), for claims related to sexual abuse that occurred when Plaintiffs participated in scouting activities. The Court previously dismissed Plaintiffs' claims for

negligence, outrage, civil conspiracy, equitable estoppel, fraudulent concealment, and willful and wanton misconduct under Fed. R. Civ. P. 12(b)(6). Dkt. # 22. The Court declined to rule on the sufficiency of Plaintiffs' allegations under the Sexual Exploitation of Children Act ("SECA"), RCW 9.68A. Plaintiffs were granted leave to amend and filed two First Amended Complaints (together, "FAC") on behalf of Boys 1, 2, & 3 and Boys 4, 5, & 6, respectively. *See* Dkt. ## 23, 24. The FAC asserted the same claims against BSA, save for the claim of "estoppel and fraudulent concealment," which was eliminated from the FAC.

The FAC included new allegations regarding the hierarchal structure of the BSA organization and details about those instances in which the local troop leaders knew about scout leaders' history of child sexual abuse but failed to warn the children of the troop. *See, e.g.,* Dkt. # 23, ¶ 16; ¶¶ 92-93; ¶ 113. Dkt. # 24, ¶ 51; ¶ 92. Plaintiffs also included gruesome descriptions of the abuse suffered by the Plaintiffs at the hands of scouting group members.

After considering Defendant's motion to dismiss the FAC, the Court dismissed Boy 1 and Boy 5's claims with prejudice but permitted Boys 2, 3, 4, and 6's claims for negligence, outrage, and SECA to proceed. Dkt. # 31. Boys 4 and 6 have since settled, leaving only Boys 2 and 3 as Plaintiffs in this action. BSA now moves for summary judgment on Boy 2 and Boy 3's remaining claims for negligence and outrage as well as the dependant SECA claim. BSA contends that the FAC should be dismissed in its entirety.

Generally, the "Scouting Movement" is comprised of three components: BSA, scout councils, and independent community organizations. BSA is a national organization that offers an educational youth program (the Scouting program) to chartered organizations. In addition, BSA maintains a database of excluded persons in relation to its sole right to exclude individuals from membership or leadership. Scout councils grant charters to community

ORDER - 2

organizations and provide Scouting publications, supplies, and training. The Scouting Movement's largest component consists of independent community organizations, such as schools, civic organizations, and churches. These organizations integrate the Scouting program into their own program, organize members into units, and appoint committees that run the unit, select leaders, and supervise those leaders.

Boy 2 was a troop member of Troop 13 in 1972. Troop 13 appears to have been sponsored by a group of parents. Leroy Van Camp was the registered scoutmaster of Troop 13. Walter Weber was Mr. Van Camp's neighbor. Although Mr. Weber had previously been a registered scoutmaster he was not a scoutmaster in 1972. Mr. Van Camp allowed Mr. Weber to participate in Troop 13's activities. Mr. Weber was not a registered troop leader or registered adult volunteer for Troop 13. Boy 2 was sexually abused by Mr. Weber while attending a troop camping trip.

Boy 3 was a troop member of Troop 666, which was sponsored by St. Monica's Catholic Church on Mercer Island. Boy 3 participated in Troop 666 from approximately 1980 to 1983. Rick Smith was the registered scoutmaster. Sometime between 1981 and 1983, Boy 3 was sexually abused by Stephen Schembs, a child member of Troop 666 who was the Senior Patrol Leader[1] for a camping trip around Ross Lake. Boy 3's abuse occurred during the weekend hiking trip.

---

[1] The Senior Patrol Leader is a youth head of the troop. *See* Dkt. # 89-14, p. 5, Scoutmaster's Handbook, p. 51.

ORDER - 3

**III. DISCUSSION**

**A. Legal Standard**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In ruling on summary judgment, a court does "not weigh the evidence or determine the truth of the matter but only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *FDIC v. O'Melveny & Myers*, 969 F.2d 744, 747 (9th Cir. 1992), *rev'd on other grounds*, 512 U.S. 79 (1994)). Material facts are those which might affect the outcome of the suit under governing law. *Anderson,* 477 U.S. at 248.

The court must draw all reasonable inferences in favor of the non-moving party. *See O'Melveny & Myers*, 969 F.2d at 747. However, the nonmoving party must "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or the court may "grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2)-(3). Whether to consider the fact undisputed for the purposes of the motion is at the court's discretion and the court "may choose not to consider the fact as undisputed, particularly if the court knows of record materials that should be grounds for genuine dispute." Fed. R. Civ. P. 56, advisory committee note of 2010. On the other hand, "[t]he mere existence of a scintilla of

evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252.

**B. Analysis**

BSA contends that summary judgment should be granted on Plaintiffs' negligence, outrage, and SECA claims because Plaintiffs have failed to raise a material issue of fact that would tend to establish BSA's liability, either directly or through an agency relationship.

1. Direct Liability

As a general rule, there is no duty to prevent a third party from intentionally harming another unless "a special relationship exists between the defendant and either the third party or the foreseeable victim of the third party's conduct." *Hutchins v. 1001 Fourth Ave. Associates*, 802 P.2d 1360, 1365-66 (Wash. 1991) (citations omitted). The duty to prevent harm arises only where "(a) a special relation exists between the [defendant] and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the [defendant] and the other which gives to the other a right to protection." *Petersen v. State*, 671 P.2d 230, 236 (Wash. 1983) (quoting Restatement (Second) of Torts § 315 (1965)). Stated differently, the duty to prevent harm arises where the defendant has either (1) a special relationship with the third party that imposes a duty to control that party's actions, or (2) a special protective relationship with the victim. *See id.* BSA contends that Plaintiffs' tort claims must fail because it did not have a duty to control Weber or Schembs, nor did it have a special protective relationship with Plaintiffs.

*a. BSA's Relationship with Weber and Schembs*

As discussed above, for the special relationship exception to apply, BSA must have had a special relationship with Weber and Schembs that imposed a duty upon it to control their

ORDER - 5

actions. Under Washington law, a special relationship that imposes a duty to control another's criminal acts requires "a definite, established and continuing relationship between the defendant and the third party." *Hertog v. City of Seattle*, 979 P.2d 400, 407 (Wash. 1999) (quoting *Taggert v. State*, 822 P.2d 243 (Wash. 1992)). The Court finds that there is no evidence from which it could conclude that BSA had a special relationship with either Weber or Schembs.

Although the Court previously determined that Boys 2 and 3 had "sufficiently pled that BSA had a special relationship with the volunteer and paid scout leaders who perpetrated the abuse" (Dkt. # 31, p. 4), Plaintiffs have failed to provide evidence that substantiates their factual allegations. Plaintiffs' FAC alleges that "BSA and BSA's local councils comprise a tightly integrated, hierarchical organization structure under BSA's control at the top," that "BSA oversees and controls all professional staffing of local councils," and that "[u]nless BSA has selected and approved them, no adult leader, whether paid or volunteer, may serve in a local troop or council." Dkt. # 23, ¶ 16. BSA's alleged ability to control the actions of Weber and Schembs, as explicated within the FAC, however, is not borne out by the evidence in the record.

First, Weber and Schembs were not troop leaders or registered volunteers at the time the sexual abuse occurred. Despite having been a scoutmaster in the past, when the abuse of Boy 2 occurred, there is no evidence that Weber was a formal member of Troop 13. Rather, as Plaintiffs acknowledge, Troop 13's then scoutmaster, Leroy Van Camp, allowed Weber to participate in Troop 13's activities. Dkt. # 89, p. 6 (citing Dkt. # 89-8, Boy 2 Dep., 34:20-24). Nor was Schembs a troop leader or volunteer of Troop 666 when the abuse of Boy 3 took place. Schembs was a scout member who acted as a Senior Patrol Leader during the weekend

camping trip around Ross Lake; he was not an adult troop leader or adult volunteer. *See* Dkt. # 84, Schembs Decl., ¶¶ 2, 7. There is no evidence to suggest that BSA had any knowledge of Weber or of his unofficial affiliation with Troop 13. There is also no evidence to show that BSA had knowledge of Schembs' scout member role as Senior Patrol Leader. Even assuming that BSA had the sole authority to select and approve troop leaders, Weber and Schembs were not troop leaders subject to any hypothetical vetting process. Thus, there is no evidence to show that BSA had a "definite, established and continuing" relationship with either Weber or Schembs.

Moreover, the duty to control another's conduct "depends on proof that the defendant was aware of the tortfeasor's dangerous propensities." *N.K. v. Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*, 307 P.3d 730, 735 (Wash. Ct. App. 2013) *review denied*, Case No. 89210-5, 2013 WL 6832344 (Wash. Dec. 11, 2013). In *N.K.*, the court rejected the plaintiff's assertion that BSA had a special relationship with an unofficial adult troop volunteer absent any evidence raising an inference that BSA knew about the volunteer's existence. *Id.* Similar to *N.K.*, no evidence has been offered to demonstrate that BSA knew about either Weber's affiliation with Troop 13, or Schembs' position in Troop 666 other than his child scout membership. Implicitly then, there is no evidence to suggest that BSA was or could have been aware of either individual's dangerous propensities.

### b. BSA's Relationship with Plaintiffs

"A duty to protect another from sexual assault by a third party may arise where . . . the defendant has a special relationship with the other that gives the other a right to protection." *N.K.*, 307 P.3d at 734-35. BSA argues that Plaintiffs cannot establish that BSA owed them a duty to prevent Weber and Schembs' alleged criminal acts because BSA did not have a special

ORDER - 7

protective relationship with Plaintiffs. BSA's argument rests primarily on a decision issued by Division 1 of the Washington Court of Appeals in which the court held that the BSA does not have a special protective relationship with former scout troop members "[b]ecause [its] relationship to the scouts [is] not custodial." *Id.* at 739. Having reviewed *N.K.* as well as Defendant's notice of supplemental authority, which shows that the Washington State Supreme Court denied discretionary review of the *N.K.* decision on December 11, 2013 (Dkt. # 93), the Court concludes that BSA did not have a special protective relationship with Plaintiffs.

*N.K.* concerned a child scout member who was sexually abused by his volunteer scout leader. The plaintiff sued BSA, his local troop's council, and two church defendants who were the troop's sponsoring organizations. The *N.K.* court analyzed prior Washington case law to conclude that a special protective relationship may arise where children are delivered into the "custody and care" of an organization. *Id.* at 738. This is because "the protective custody of the [organization] is substituted for that of the parent." *Id.* (citations omitted). When considering BSA's relationship with the child troop member, however, the court determined that BSA did not have a custodial relationship with the plaintiff because it was "not in a position to provide protection from physical danger as a school or church group does for children, or to monitor personal care as a hospital or nursing home does for disabled patients." *Id.* at 739. Absent evidence that an organization like BSA maintains a custodial relationship with its child members by exerting "on-the-ground control of day-to-day operations" such that it is capable of providing those members protection from harm, a special protective relationship may not be found. *See id.* Here, there has been no evidence presented to show that BSA controlled the day-to-day operations of Troop 13 or Troop 666.

ORDER - 8

Plaintiffs appear to recognize the force of *N.K.*'s holdings and make no attempt in the briefing to distinguish that opinion from this case. *See* Dkt. # 89, p. 10. Directly on point, *N.K.* makes clear that no special protective relationship exists because BSA's relationship with the scout members was not custodial.

2. Vicarious Liability

Plaintiffs contend that even if BSA did not have a special relationship with Plaintiffs, or with Weber and Schembs, BSA still may be found liable for the negligent acts of "the local sponsoring organizations and troop leaders." Dkt. # 89, p. 11. Plaintiffs contend that the local sponsoring organizations and troop leaders of Troops 13 and 666 were agents, or apparent agents of BSA. Plaintiffs also contend that BSA is vicariously liable for the tort of outrage for the acts of BSA's purported agents.

Consent and control are the essential elements of the agency relationship. *Moss v. Vadman*, 463 P.2d 159, 164 (Wash. 1969). Generally, when a corporation's agent acts within the scope of its authority, those acts are considered the acts of the corporation. *Mauch v. Kissling*, 783 P.2d 601, 604 (Wash. Ct. App. 1989). In addition, the corporation may also be liable for the acts of a person acting with apparent authority. *Id.* Such apparent authority, however, may only be inferred from the acts of the principal. *Id.* Further, there must be evidence to show that the principal had knowledge of the actions taken by its agent for the apparent agency theory to apply. *Id.* at 605.

Plaintiffs contend that the evidence shows (1) that "BSA consented to engage local sponsoring agents organizations and troop leaders to act on its behalf and for its benefit," (2) that "local sponsoring organizations and troop leaders consented to perform tasks on BSA's behalf and for BSA's benefit," and (3) that "BSA retained the right to control the local

ORDER - 9

sponsoring organizations' and troop leaders' manner of performance relating to implementation of BSA's scouting program." Dkt. # 89, p. 12. Having considered the evidence in the light most favorable to Plaintiffs, the Court finds that the evidence presented does not create a material issue of fact about whether the local organizations or troop leaders were BSA's agents.

In *Mauch v. Kissling*, the court addressed the role played by local sponsoring organizations and scout leaders. It noted "[t]he troop committee and the scoutmaster are volunteer workers whose services are given to the community rather than to the [BSA] which is, in practical effect, merely an advisor rather than an employer." 783 P.2d at 605 (quoting *Young v. Boy Scouts of Am.*, 51 P.2d 191 (Cal. App. Ct. 1935). The *Mauch* court concluded that there was no basis to impute liability to the BSA without evidence that BSA had consented to or had control over the acts of a volunteer scout leader. *Id.*

When faced with a motion for summary judgment where plaintiffs have put forth BSA's scouting pamphlets and guidelines as evidence of BSA's structural control and consent, other state courts have held that such evidence is insufficient to create a material issue of fact with respect to agency. For example, in *Glover By & Through Dyson v. Boy Scouts of Am.*, 923 P.2d 1383, 1388-89 (Utah 1996), the court rejected the plaintiff's arguments that BSA's supply of uniforms and patches, and BSA's written guidelines and other scouting materials were sufficient to raise a material issue over whether BSA had the right to control the activities of the sponsoring organizations or troop leaders. It held that because BSA acts in a chartering and advisory capacity, it "does not retain the right to control day-to-day troop operations." *Id.* at 1388. The court also stated

> [w]e note that our decision today is in accord with the vast majority of jurisdictions which have held as a matter of law that under the

ORDER - 10

> organizational structure described above, neither the BSA nor a local council has a right to control the conduct of scoutmasters in connection with troop activities that are not directly sponsored or supervised by the BSA or a local council.

*Id* (collecting cases and citing *Mauch*).

BSA contends that Plaintiff's evidence compels the same result. The Court agrees. The evidence fails to show that BSA maintained the right to control the day-to-day activities of the troop leaders or sponsoring organizations. Plaintiffs continue to cite statements from a brief submitted by BSA in *Boy Scouts of Am. V. Dale*, 530 U.S. 640 (2000) as evidence that BSA maintained control over the selection, supervision, and retention of troop leaders. However, the Court previously stated that "BSA can retain control over the registration process while not retaining control over the day to day activities of scout leaders." Dkt. # 22, p. 8 n.2. As the *Glover* court noted, "we fail to see how the right to discharge [a scout leader] on these specific grounds would in any way manifest the BSA's right to control the day-to-day operations of regular troop meetings." 923 P.2d at 1388. Plaintiffs failed to substantively address the Court's prior statement or the reasoning set forth in *Glover* to explain how BSA's control of the registration process manifested a right to control the day-to- day activities of the troop leaders of Troop 13 or Troop 666. There has been no evidence offered to show that BSA exerted, or had the right to exert control over these scoutmaster's activities.

Plaintiffs also rely on the BSA Charter and Bylaws, a publication titled "Securing a Scoutmaster," and the "Troop Committee Guidebook" to argue that BSA's policies for implementing a scouting program manifested BSA's right to control. But as stated by several other courts, no provision cited within these materials "specifically grant BSA or its district councils direct supervisory powers over the method or manner in which adult volunteers scout leaders accomplish their tasks." *Anderson v. Boy Scouts of Am.*, 589 N.E.2d 892, 894-95 (Ill.

ORDER - 11

App. Ct. 1992); *see also Wilson v. United States*, 989 F.2d 953, 958-59 (8th Cir. 1993) ("the organizational structure of the BSA leaves the control of the specific activities at the level closest to the individual troop").

BSA's Charter and Bylaws do not establish BSA's right to control the activities of the sponsoring organizations or scoutmasters. The Bylaws grant to BSA the "power to grant charters to [organizations]" that meet the requirements of the Bylaws as well as the power to revoke charters when warranted. Dkt. # 83-3, Ex. A, Bylaws art. XII. The Bylaws state that "charters may be granted to institutions upon application . . . [and] [s]uch applications shall obligate the institutions to provide adequate facilities, supervision, and leadership . . . ." *Id.* The charters may be renewed provided that the renewal application "shows a satisfactory effort to carry out the Scout program . . . ." *Id.* Importantly, the Bylaws make no mention of BSA's right to control the day-to-day activities of any particular sponsoring organization and in fact require that a sponsoring organization commit to providing its own "facilities, supervision, and leadership" for scouting activities. Moreover, that BSA promulgated a policy for securing a scoutmaster, or that its printed materials outlined a procedure for training scout leaders does not manifest its right to control the day-to-day activities of a local troop. *See* Dkt. # 89-7, pp. 5-7, Troop Committee Guidebook; *see* Dkt. # 90-1, ¶ 3, Jolly Decl. (assistant Troop 13 scoutmaster testifying that BSA was not involved with planning, organizing, or supervising the troop); *see also* Dkt. # 87-10, F. Schembs Dep. 23:5-10 (former Troop 666 scoutmaster recalling that his connection to BSA was "very limited" in that it "was the source of merit badges, rank badges . . . imposed the guidelines" and provided the scouts with books).

Contrary to Plaintiffs' assertion that BSA "controlled or maintained a right to control all critical functions of the local sponsoring organization" (Dkt. # 89, p. 14), the evidence

ORDER - 12

suggests only that the right to control the day to day functions of the local troop remained with the local troop and sponsoring organization. In *Glover*, the court stated that

> the basis for the right must be evident from the facts as they exist. Glover cannot establish the basis for the right by merely speculating that under a different organizational structure the BSA and the Council could have retained the right to control scoutmasters at regular troop meetings. Such speculation is insufficient to create a genuine issue of material fact for purposes of a summary judgment motion.

923 P.2d at 1388. The same is true here. Plaintiffs have failed to raise a material issue of fact with respect to agency.

Lastly, Plaintiffs contend that BSA should be held vicariously liable through the doctrine of apparent agency. Apparent agency may be found where the actions of the principal lead a reasonable person to believe that a third party wrongdoer is the putative agent of the principal. *D.L.S. v. Maybin*, 121 P.3d 1210, 1213 (Wash. Ct. App. 2005). "The doctrine has three basic requirements: the actions of the putative principal must lead a reasonable person to conclude the actors are employees or agents; the plaintiff must believe they are agents; and the plaintiff must, as a result, rely upon their care or skill, to her detriment." *Id.* Plaintiffs contend that by providing Boy Scouts insignia and uniforms to troop leaders, BSA created the appearance of an agency relationship upon which the Plaintiffs reasonably relied.

This argument has been rejected by other courts. *Wilson*, 989 F.2d at 959 (rejecting plaintiff's contention that when BSA provided uniforms, books, awards, and membership cards, among other things, it created an agency relationship); *Glover*, 923 P.2d at 1388-89 (finding argument without merit); *cf. Mauch*, 783 P.2d at 605 (affirming summary judgment on apparent agency). In *Wilson*, the Eighth Circuit Court of Appeals held that the appellant former scout members failed to establish a jury question as to whether an apparent agency relationship existed when they failed "to produce any evidence that BSA manifested that it had direct

ORDER - 13

control over the specific activities of individual troops or that it had a duty to control, supervise, or train volunteer leaders . . . ." 989 F.2d at 959. The court concluded that BSA's acts of supplying uniforms, insignias, and scouting policies and guidelines did not evidence BSA's manifestation of its authority to control a local troop upon which a reasonable person could rely. *See id.* Similarly, Plaintiffs have failed to submit evidence of BSA's manifestation of authority to control Troop 13 or Troop 666. Thus, BSA cannot be held vicariously liable for Plaintiffs' claims for negligence or outrage because the troop leaders and local sponsoring organizations were not BSA's actual, or apparent, agents.[2]

3. SECA Claim

The Court stated previously that although it declined to address whether the attorney's fees provision of SECA applies in this action, Plaintiffs must prevail in order to claim attorney's fees pursuant to SECA. Dkt. # 22, p. 15. Because Plaintiffs' remaining substantive claims have failed to survive BSA's summary judgment motion, there can be no recovery for attorney's fees under SECA. Accordingly, BSA's motion is granted in its entirety.

## IV.  CONCLUSION

Having reviewed the motions, the responses and replies thereto, the attached declarations and exhibits, and the balance of the file, the Court hereby finds and ORDERS that Defendant's Motion for Summary Judgment (Dkt. # 83) shall be GRANTED.

---

[2] Plaintiffs cite only one case from another jurisdiction that found, on summary judgment, that an adult volunteer could be an agent of the BSA. *Mayfield v. Boy Scouts of Am.*, 643 N.E.2d 565, 569 (Ohio Ct. App. 1994). *Mayfield* is against the weight of authority and contrary to the only Washington case to address the issue. *See Mauch*, 783 P.2d at 605.

ORDER - 14

Dated this 8th day of January 2014.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER - 15